14 A.3d 1223

STATE of Maryland, et al.

v.

Kimberly JONES.

No. 2178, Sept. Term, 2009.

Court of Special Appeals of Maryland.

March 1, 2011.

Matthew J. Fader (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellant.

Cary J. Hansel (Joseph M. Creed, Joseph, Greenwald & Laake, PA, on the brief), Greenbelt, for appellee.

Panel: DEBORAH S. EYLER, GRAEFF, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

GRAEFF, J.

This appeal arises from a confrontation that ensued during an attempt to serve an arrest warrant on an individual believed to reside at the home of Kimberly Jones, appellee and cross-appellant. On September 21, 2009, a jury in the Circuit Court for Prince George's County found the State of Maryland, appellant and cross-appellee,[1] liable for negligent retention, supervision, or training of Sheriff's Deputies Billy Falby and Gerald Henderson. It awarded damages in the amount of $261,000, but the court subsequently reduced the judgment

---

1. The notice of appeal lists Deputy Falby and the State of Maryland as appellants. The arguments raised by the parties on appeal, however, address only the judgment against the State for negligent retention, supervision, and training.

pursuant to the Maryland Tort Claims Act, entering judgment in favor of Ms. Jones in the amount of $200,000.

On appeal, the State presents the following questions for our review, which we quote:

1. Did the circuit court err in entering judgment against the State when the State did not owe any duty to Ms. Jones individually, as opposed to the public generally, with respect to the retention, supervision, and training of Deputies Falby and Henderson?

2. Did the circuit court err in entering judgment against the State even though Ms. Jones failed to present evidence that the State owed a duty or breached a duty with respect to its retention, supervision, and training of Deputies Falby and Henderson, and failed to present evidence that any such breach was a proximate cause of her alleged damages?

3. Did the circuit court err in entering judgment against the State as to Ms. Jones's claims for negligent retention, supervision, and training, where she failed to present evidence of any such negligence related to battery, the only tortious act that the jury found either Deputy to have committed?

4. Did the circuit court err in entering judgment against the State as to Ms. Jones's claims for negligent retention, supervision, and training, where the State had already accepted direct liability for the only tortious act that the jury found either Deputy to have committed?

Ms. Jones filed a cross-appeal, presenting two questions for our review, which we have rephrased slightly:

(1) Did the circuit court err in reducing the judgment pursuant to the Maryland Tort Claims Act, which caps the State's liability at $200,000 "to a single claimant for injuries arising from a single incident or occurrence," when Ms. Jones's injuries arose from multiple incidents or occurrences?

(2) Does the Maryland Tort Claims Act violate the constitutional mandate of separation of powers between the legislative and judicial branches of government?

For the reasons set forth below, we shall reverse the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 15, 2006, at approximately 11:30 a.m., Deputies Billy Falby and Gerald Henderson went to 151 Westway Center Drive, an apartment building in Greenbelt, Maryland, to serve a domestic violence arrest warrant on Lamarr Wallace.[2] Once at the location, the deputies realized that the address was for the apartment complex, without an apartment number listed. The deputies made a phone call to the complainant to obtain the apartment number, and as a result of that call, they proceeded to Ms. Jones' apartment.

The deputies knocked on the door and announced that it was the Prince George's County Sheriff's Office. Ms. Jones, who was asleep at the time, asked the officers to "hold on," and she put on a robe. The deputies heard doors opening and closing inside the apartment, and they were concerned that Mr. Wallace might be trying to escape.

When Ms. Jones answered the door, she informed Deputy Falby that Mr. Wallace did not live there. What occurred next is disputed by the parties, but the parties agree that a confrontation occurred between the deputies and Ms. Jones, first inside her apartment, and later, in the parking lot of the apartment complex. Ms. Jones ultimately was arrested and charged with hindering an investigation, assault on an officer, escape, and resisting arrest, charges that subsequently were entered nolle prosequi.

---

**2.** At the time of the incident, Deputy Falby and Deputy Henderson occupied the rank of Sheriff's Deputies; they have since been promoted to the rank of Corporal. For consistency purposes, we will use the designation of "Deputy" throughout this opinion.

On November 27, 2007, Ms. Jones filed a Complaint in the Circuit Court for Prince George's County, naming Deputy Falby, Deputy Henderson, and the State of Maryland as defendants. She asserted the following claims: (1) Violation of Maryland Declaration of Rights, Article 26; (2) Violation of Maryland Declaration of Rights, Article 24; (3) False Arrest; (4) Trespass to Land; (5) Trespass to Chattels/Trover and Conversion; (6) False Imprisonment; (7) Battery; (8) Malicious Prosecution; (9) Intentional Infliction of Emotional Distress; and (10) Civil Conspiracy.

On December 24, 2007, the defendants filed their answers. All defendants generally denied liability and asserted that Ms. Jones failed to state a claim for which relief could be granted. In addition, they asserted as follows: (1) immunity under the Maryland Tort Claims Act ("MTCA"); (2) assumption of risk and/or contributory negligence; (3) any damages should be capped under the MTCA at $200,000; (4) the alleged acts did not rise to the level of malice or gross negligence; (5) legal justification and privilege; (6) the deputies acted reasonably, in good faith, without negligence, with due care, and in compliance with the law; (7) the deputies' actions were supported by reasonable suspicion, probable cause, and/or were made pursuant to a valid arrest warrant; and (8) immunity under the doctrine of common law public official immunity.[3]

On November 21, 2008, Ms. Jones filed an Amended Complaint, adding Counts XI and XII, the claims of negligent retention and negligent training and supervision. With regard to the claim of negligent retention, Ms. Jones asserted that Deputies Falby and Henderson "have committed violations such as those at issue here previously"; those "prior transgressions of the individual defendants are such as to put the State on notice that the individual defendants are unfit for duty"; such transgressions gave "rise to a duty to terminate the employment of the individual defendants"; the State nonetheless "negligently maintained their employment"; and that,

---

3. The State separately asserted the defense of sovereign immunity and that it was not liable for punitive damages.

as a result, the deputies "were put in [a] position to commit the other wrongs alleged in this case," directly and proximately causing injury to Ms. Jones. With regard to the claim of negligent training and supervision, Ms. Jones asserted that the "State has a duty to individuals such as Ms. Jones to properly train and supervise officers such that they do not violate the rights of citizens;" the State breached this duty by "failing and refusing to properly train and supervise" Deputies Falby and Henderson; the deputies "were trained that they may forcibly enter a person's home without a search warrant in order to serve an arrest warrant for someone who does not live there;" and as a result, the Deputies "committed the other wrongs alleged in this case," directly and proximately causing injury to Ms. Jones.

On December 10, 2008, the defendants filed answers to the amended complaint, raising two more defenses: (1) the plaintiff failed to comply with the mandatory notice requirements under the MTCA; and (2) the claims were barred by the statute of limitations and/or laches. On January 5, 2009, the defendants filed a Motion for Partial Summary Judgment, arguing, among other things, that the claims of negligent retention and negligent training and supervision could not be established as a matter of law. The defendants argued that Ms. Jones could not establish that they "owed her any legally actionable duty that could form the basis of her negligence claims, *i.e.,* that the State specifically owed *her in particular,* versus the public in general, a duty of care, or that any special relationship was formed between her and the State." On March 5, 2009, the court denied the motion.

Prior to trial, the parties filed several motions in limine. Ms. Jones filed a motion to exclude evidence of her alleged contact with Mr. Wallace. She argued that the only contact of which the Deputies were aware at the time that they obtained and executed the warrant was based on information provided by a single witness. She asserted that any other inquiries regarding her contact with Mr. Wallace "should be excluded as irrelevant, confusing, more prejudicial than probative and an attempt to introduce impermissible character evidence to

tar Ms. Jones through 'guilty by association.'" The court granted the motion regarding evidence of a joint bank account held by Ms. Jones and Mr. Wallace, but it denied the motion regarding evidence that Mr. Wallace occasionally listed Ms. Jones' address as his own and occasionally stayed overnight at her house.[4]

The State also made a Motion in Limine, to exclude any reference by Ms. Jones to any prior complaints or allegations of bad acts relating to Deputy Falby. The State advised that Deputy Falby was a defendant in two other lawsuits, one of which was resolved by summary judgment in favor of Deputy Falby, and the other that was still pending. The State argued that reference to these allegations of other bad acts would be unfairly prejudicial. The court provisionally granted the motion, stating that it would reconsider its decision if the evidence adduced at trial indicated that it was relevant, *i.e.*, if a duty on the part of the defendants was established or if it was appropriate as impeachment testimony.

Trial commenced on March 16, 2009. On direct examination of Deputy Falby, counsel for Ms. Jones asked the court to reconsider its previous ruling that it could not ask Deputy Falby about his prior bad acts, arguing that there was evidence that Deputy Falby previously had improperly charged an individual with assault on an officer and failed to appear for trial, and this evidence was relevant to show intent and malice. The court ruled that, because there was no evidence that Deputy Falby received a summons to appear for the other trial, it would not allow the evidence. The court indicated that it would reconsider the issue if it became appropriate as impeachment evidence.

Ms. Jones then asked Deputy Falby if he had ever been disciplined by the Department. When the State objected, counsel argued that it was necessary to introduce evidence of prior complaints against Deputy Falby to establish the notice

---

4. At the second trial, the State was permitted to bring out, on cross-examination, the existence of the joint bank account.

element of the negligent hiring and retention claim against the State.[5] The State continued to object, arguing that: (1) any duty owed by the State to protect the public was owed to the public and not Ms. Jones personally, and therefore, there was no evidence to support a tort claim for negligent retention; and (2) any complaints filed involved matters of internal affairs, which were confidential.

The court ruled that Ms. Jones had "satisfied the burden of demonstrating the need for this material," and it permitted an examination of Deputy Falby outside the presence of the jury. The court sealed this testimony.

During the discussion after the testimony, the court summarized the testimony as indicating that there were two potentially relevant lawsuits, one involving a complaint by a prisoner as to insufficient medical care and the other involving excessive force, *i.e.,* punching an inmate in the face. The court stated:

This is what I'm trying to do. I'm trying to think of a way to let the jury know that which needs to be known that's relevant to the issue of the negligent hiring and training and not to exclude that. Because for those purposes I think its clearly more probative than prejudicial, as long as we limit what's being told for the purposes of what's needed for the notice requirement for negligence.

But even with a curative instruction, I'm not going to allow it to get into the whole issue of an assault and then the broken hand and all that, because it's more prejudicial than probative and, secondly, that opens up just a pandora's box of a whole other line of examination.

Counsel for the State then stated that, if the court was determined to admit this unfairly prejudicial evidence, it was "necessary to sever the [negligence] counts and conduct a separate trial as to those matters." The discussion continued:

---

**5.** Counsel for Ms. Jones stated that he did not know if there were prior complaints against Deputy Falby that did not result in lawsuits. Although he had asked the question at Deputy Falby's deposition, Deputy Falby was instructed not to answer.

**648**

THE COURT: I'm not entirely adverse to severance. My concern is—and I think I've said this from the beginning— my concern is that some of these complaints are clearly relevant to the issue of negligent hiring and retention and supervision. And how does one weigh that with the undue prejudice that may come in on the other causes of action?

So I'm not entirely adverse to a severance as to those causes of action. I'm not sure that would be not the most fair thing to everybody involved.

\* \* \*

[Counsel for Ms. Jones], I will hear you briefly on the issue of severance, but I think that might be the best resolution of what's clearly, I think, a problem. . . .

[COUNSEL FOR MS. JONES]: I just want to say I object to severing at this point. It's prejudicial because it's too late to let me know we're going to sever. I've built a case on the complaint that we're here on. I've litigated the case on the complaint that we're here on. To sever mid trial causes that prejudice. It also causes the further prejudice of delay and cost, and I will submit on that.

THE COURT: The Court is going to sever . . . I think I made it clear on the record, but let me do it again.

It seems to me that these complaints are quite important to get to the issue of the negligence, the various negligen[ce] claims in this case.

I have also determined, at least up until this point, that they would be more prejudicial than probative as to the remaining counts in this case.

I have considered how it is that I could instruct the jury and restrict conversation and testimony in evidence relative to these complaints in a way that we don't cross some barrier to unduly prejudice the defendant.

On the other hand, I think to not allow those complaints in is unfair and unduly prejudice [sic] to the plaintiff as to her negligen[ce] counts. And I think the only equitable way to resolve it, despite the additional expense which might otherwise be incurred through the appellate process be-

cause of the complications that would arise, that I will sever the negligent [retention, training, and supervision] counts from the remaining counts.

Trial then resumed. At the conclusion of the six-day trial on counts I through X, the jury found in favor of Deputy Henderson and the State on all counts, and in favor of Deputy Falby on all counts except the battery claim. On the battery claim the jury found in favor of Ms. Jones, against Deputy Falby, awarding no economic damages, but $5,000 in non-economic damages.

On March 26, 2009, the court signed an order staying entry of the judgment "pending determination of all the counts." [6] On April 2, 2009, Ms. Jones filed a Motion for New Trial, And to Alter and Amend Verdict, which the court denied on May 8, 2009.

On August 17, 2009, prior to the second trial on Counts XI and XII, negligent retention and negligent training and supervision, the State filed a Motion for Summary Judgment. It argued that "Ms. Jones cannot show that the State breached any duty that she can show it owed to her or that such breach caused her any damages." It further argued that "Ms. Jones, having had the benefit of a jury trial adjudicating her claims against the State with respect to Deputy Falby's and Deputy Henderson['s] alleged actions ... is not entitled to a second trial in which she seeks to hold the State liable for the same set of events under a different legal theory, negligent retention." After Ms. Jones filed her opposition, the court denied the motion.

On September 14, 2009, a second trial commenced before a different jury on the claim of negligent retention, training, and supervision. Ms. Jones testified that, prior to the incident on September 15, 2006, she was employed as a youth care worker

---

6. Although the court ordered that entry of the judgment be stayed, on April 7, 2009, the clerk entered the judgment. On October 6, 2009, after the conclusion of the second trial, the court signed an order vacating the judgment for $5,000 that was "mistakenly entered by the Clerk" citing to the order of the court staying entry of the judgment.

at Father Flanagan's, an emergency shelter for young teenagers. On September 15, 2006, after her night shift ended at 8:00 a.m., Ms. Jones went home and went to sleep. At approximately 11:30 a.m., Ms. Jones awoke to a knock at her door and an announcement that it was the Sheriff's Department. It took Ms. Jones a couple minutes to answer the door because she had been asleep, and she needed to go to her closet to get a robe. When she opened the door, Deputy Falby immediately placed his foot across the threshold of her home. He advised that he and Deputy Henderson were looking for Mr. Wallace. Ms. Jones testified that she knew Mr. Wallace, and he sometimes spent an evening at her house along with other friends, but he did not live with her.[7] When she told Deputy Falby that Mr. Wallace did not live with her, he responded: "[W]ell, we [are] coming in whether you like it or not."

Ms. Jones asked to see a warrant, but Deputy Falby told her that his supervisor had it. At this point, Deputy Henderson had walked around the side of the apartment complex and was standing outside Ms. Jones' patio door. She turned around to see who was tapping on her door, and when she turned back, Deputy Falby pushed the door open and punched her in the eye. Ms. Jones fell back into her foyer and hit her head on a closet door.

Ms. Jones testified that, because the police were not wearing traditional uniforms, and because Deputy Falby punched her in the face, she did not believe they were police officers. She "began to defend [her]self," but by this time, Deputy Henderson had broken through the glass of her patio door, and he "maced" her. She was able to get away from the officers and ran into the hallway, where she began banging on her neighbors' doors for help. She testified that the officers followed her and hit her with a baton and again sprayed her with mace.

---

7. On cross-examination, Ms. Jones testified that, at one point, she had shared a checking account with Mr. Wallace.

Ms. Jones then ran into the parking lot of her apartment complex. She ran toward several Greenbelt police officers, but they backed away. Deputies Falby and Henderson caught up with her, banged her head against a car, and handcuffed her. Ms. Jones testified that she was still wearing her robe, and she was not permitted to go into her house to get dressed. Rather, she was forced to dress outside, in front of her building. She stated that she was "mortified, ashamed ... upset, scared." After she was dressed, Deputy Falby took Ms. Jones to the hospital, where she was treated for a head injury, and then to jail, where she spent the night until her friends bailed her out the next morning.

Deputy Falby testified next. He testified first with regard to his experience and training. He attended the police academy for six months before starting with the Sheriff's Department. After he was sworn in, he continued to receive on-the-job training, and he received a re-certification each year. Part of his training included keeping abreast of legal developments, including issues regarding the service of an arrest warrant. He was trained that when a door was opened to him, he should place his foot against the door to prevent it from closing, as a safety measure.

Deputy Falby then testified with regard to the events on September 15, 2006. He and Deputy Henderson were assigned to serve an arrest warrant on Mr. Wallace. They were in unmarked cars, and they were wearing "BDUs," "battle dress uniform," which is dark blue and includes a badge, name tag, and full duty belt. When he and Deputy Henderson arrived at 151 Westway, they realized that the address listed on the warrant was that of an apartment complex, but it did not list an apartment number. Deputy Falby called the complainant, and he and Deputy Henderson subsequently went to apartment T–3.[8]

---

8. Deputy Falby testified that, pursuant to his training, he was not required to take further steps, such as checking the address with management or reviewing public records, to ascertain whether the

When Deputies Falby and Henderson knocked on Ms. Jones' door, a female voice asked who was there. After the deputies identified themselves, the woman stated: "[W]ait a minute." Deputy Falby heard a door open and close. He and Deputy Henderson continued to wait, but eventually, they became concerned that Mr. Wallace might be trying to escape. Deputy Henderson went around to the back of the apartment. Deputy Falby believed that there was someone besides Ms. Jones inside, and that Ms. Jones was trying to protect Mr. Wallace by saying that he was not there. Therefore, when Ms. Jones opened the door, he blocked it with his foot. He testified that he was trained to place his foot against the door after it was opened to prevent someone from obtaining a weapon, or restricting access to the residence to allow the officers to search the location for the subject of the arrest warrant.

When Ms. Jones asked if there was a warrant, Deputy Falby tried to radio to Deputy Henderson, but his message was not communicated due to poor radio service.[9] When Ms. Jones tried to close the door, he did not let her, and instead, he pushed the door back. Ms. Jones let go of the door, which flung open, and Deputy Falby entered the apartment.

Deputy Falby testified that, once he was in the apartment, Ms. Jones was screaming and hit him in the face, knocking his glasses off. In response to the confrontation, Deputy Henderson broke through the patio door and sprayed Ms. Jones with mace. Both he and Deputy Henderson tried to grab Ms. Jones, but because his glasses had been knocked off and he also had been sprayed with mace, Ms. Jones was able to get away and run into the hallway and then the parking lot outside the apartment. He and Deputy Henderson ran after Ms. Jones, cornered her between two vehicles, leaned into her with their bodies, and used an "arm bar technique," also

---

individual named in the warrant lived at the address listed in the warrant documentation.

9. Deputy Falby testified that he is trained to show individuals such as Ms. Jones a warrant out of courtesy, but he was not required to do so.

known as a pain compliance measure, to handcuff her. Deputy Falby testified that he never hit Ms. Jones, and he did not know how she got her injuries. He stated that everything he did that day was consistent with his training.

After Ms. Jones was handcuffed, Deputy Falby gave her a sheet to cover herself and a towel to wipe off the mace. Deputy Falby testified that, at the request of Deputy Henderson, a female Greenbelt police officer escorted Ms. Jones back to her apartment to get dressed. After she was dressed, Ms. Jones was taken to the hospital, which was standard procedure for contamination due to mace. At the hospital, Deputy Falby was present when Ms. Jones spoke with medical personnel, but he did not recall hearing Ms. Jones discuss a head injury.[10]

Deputy Falby subsequently charged Ms. Jones with hindering an investigation and assault on an officer.[11] As part of his statement of charges, he requested a summons for trial. He testified, however, that he did not show up for trial because he never received notice of the trial date. Deputy Falby's supervisors later notified him that the charges against Ms. Jones had been dropped, and he did not do anything further to see to it that the charges were re-filed.

Deputy Falby testified regarding a pending lawsuit against him for use of excessive force against an inmate, relating to an incident that occurred approximately a year and a half before the incident with Ms. Jones. Deputy Falby was assisting with the transport of 48 to 60 prisoners who were chained together

---

10. Ms. Jones testified that, as a result of the confrontation with Deputies Falby and Henderson, she suffered a black eye, neck strain, head pain, and a bald spot where part of her hair was pulled out.

11. He acknowledged that the charge of assault on an officer was a mistake because he was not actually injured, a requirement for such a charge. *See* Md.Code (2002, 2006 Supp.), § 3–203(c)(2) of the Criminal Law Article ("A person may not intentionally cause physical injury to another if the person knows or has reason to know that the other is a law enforcement officer engaged in the performance of the officer's official duties.").

in a line.[12] One of the inmates, Terron Williams, got into an argument with another officer, and Deputy Falby went over to unchain the inmate to separate him from the group because he was becoming increasingly agitated and inciting the other inmates. The inmate shoved Deputy Falby and was coming toward him, so Deputy Falby punched the inmate in the head, breaking his own hand. Deputy Falby charged the inmate with assault on an officer despite the fact that he was not injured by the inmate. He did not appear for court in that case because he did not receive the notice of the trial date. Deputy Falby testified that he and other deputies were questioned by the Internal Affairs Division regarding the incident, but he was not disciplined or required to take additional training.

Deputy Gerald Henderson testified next. His testimony was consistent with the testimony of Deputy Falby with regard to the events that took place inside Ms. Jones' apartment, as well as in the parking lot complex. Deputy Henderson did not see Deputy Falby shove Ms. Jones or do anything inappropriate. With respect to his training, he testified that he attended Howard County Police training for six months, where he was trained in arrest procedures, warrant service and initiation of criminal proceedings, and when he joined the Prince George's County Police Department, he attended a six week Experienced Police Officers Academy. He received periodic in-service training at the Howard and Prince George's County Police Departments, and has periodic in-service training with the Prince George's County Sheriff's Department. He was trained that for "an officer's safety," he should not let an open door close on him.

The next witness, Angela Bolder, was unavailable, so her testimony from the first trial was read into evidence. On September 15, 2006, she lived in the apartment next door to

---

12. The transcript reflects that the State asked Deputy Falby whether there were "more than 15 inmates" being transported. The Deputy's responses to the questions asked immediately prior to this question, however, indicated that the number of inmates was approximately "50" not "15."

Ms. Jones, and she called 911 after she heard Ms. Jones in the hallway screaming: "Help me. Can you help me. Can you help me." When she looked through her peep hole, she saw a man in the hallway who had Ms. Jones pressed against the wall and who hit her with a "stick." She called 911 because she could not tell whether the man was a police officer because he was wearing dark clothing.

Sandy Frye, a childhood friend of Ms. Jones, testified that Mr. Wallace, the subject of the arrest warrant, was her brother, and he lived with her at the time of the incident. On the day that Ms. Jones was arrested, she and her brother began walking to Ms. Jones' house, but along the way, Mr. Wallace was arrested. When she picked up Ms. Jones from jail the next day, Ms. Jones had a black eye, and she had a bald spot in the back of her head. They went to Ms. Jones' apartment, where they noticed hair on the floor, and Ms. Frye took pictures using her cell phone camera.

On cross-examination, Ms. Frye stated that Mr. Wallace spent most nights at her house, but occasionally he would spend the night at Ms. Jones' house.[13] She testified that, to her knowledge, Mr. Wallace had never lived at 151 Westway in Greenbelt, Maryland.

After Ms. Jones rested her case, the State made a motion for judgment, adopting the arguments made in its earlier motion for summary judgment and further arguing that the sheriff owed no duty to Ms. Jones, that the sheriff was entitled to immunity, and the plaintiff failed to establish the elements of her claim. It argued that, with respect to the negligent retention claim, there was no evidence that the sheriff was on

---

**13.** The State proffered the following four documents, reflecting that Mr. Wallace resided at 151 Westway, to impeach the testimony of Ms. Frye: (1) a writ of summons in a case, listing delivery of a complaint to Mr. Wallace at 151 Westway and claiming that he was a "roommate or co-resident"; (2) a writ of summons in the same case, listing Mr. Wallace's address as 151 Westway; and two court documents, which appeared to have been filled out by Mr. Wallace, listing his address as 151 Westway. The court sustained plaintiff's objection to the first two documents, but permitted the State to introduce the two documents into evidence that purported to have been filled out by Mr. Wallace.

notice of "the allegations related to Terron Williams." With respect to the claim regarding training and supervision, it argued that there was "no expert testimony offered to suggest that [the deputies] didn't perform their work properly as law enforcement officers" or that anything that "the sheriff did in supervision or education of these deputies . . . could have caused any wrongful harm to the plaintiff." The State contended that Ms. Jones failed to call any training witness, and she did not admit into evidence any guidelines, rules, manuals, general orders, etc. that showed improper training or supervision. It asserted that the only testimony regarding any impropriety was Deputy Falby's testimony regarding his decision to charge Ms. Jones with assaulting a police officer, which was erroneous because he did not suffer an injury. Deputy Falby testified, however, that he was trained correctly, and he just made a mistake.

Ms. Jones argued that all of the elements of the claim of negligent training, supervision, and retention had been met. Initially, she argued that the sheriff need not be personally aware of something to be on notice, asserting that it was sufficient that the chain of command was on notice, which it was in both the Terron Williams incident and the incident involving Ms. Jones. Moreover, she argued that the State did have a duty not to negligently train, supervise and retain employees. Ms. Jones argued that there was a "panoply" of evidence regarding improper training, including, for example, the deputies' testimony that they were trained to put their foot over the threshold once a door was opened, which counsel argued was a constitutional violation. Counsel argued that expert testimony was not required because the violations were of constitutional and legal standards, which should be conveyed to the jury by the court during instructions. Finally, Ms. Jones argued that there was no qualified immunity in this case because there was no claim against an individual; the case involved "a direct claim against the [S]tate for negligence."

In response, the State argued that the Law Enforcement Officer's Bill of Rights ("LEOBR") "precludes the sheriff from

discharging the deputy, absent appropriate procedures having been followed ... including a guilty finding before a trial board." It asserted that the LEOBR "prohibits the sheriff from carrying out disciplinary action absent a sustained finding, which plaintiff has not put on any evidence of in this case."

The State further argued that it "has already been held liable for the deputies direct actions" in the first trial, and "there is no separate liability through negligent retention." With regard to the deputies' actions, the State noted that the assertions of negligent training involved two things: (1) the officer putting his foot in the door when it was opened; and (2) the erroneous charge. With respect to the foot in the door, the State argued that there was no case stating that this was impermissible, and even if it was, this action was not causally related to any damage claim. With respect to the erroneous charge, the State noted that, although the officer may have erroneously charged Ms. Jones with assault with injury to a police officer, there was no evidence that the other charge was improper. It further argued that the only potential damages from the improper charge were lost wages, but Ms. Jones did not submit evidence to support this claim.

The court denied the State's motion for judgment, stating: "Considering all of the evidence in the light most favorable to the plaintiff at this point, the Court finds sufficient evidence at this point to send to the jury on the issues before it, which are the negligence issues. So the motion will be denied." [14]

Ms. Jones subsequently made a motion for judgment as to the defendant's LEOBR defense, arguing that it was an affirmative defense that the State failed to raise earlier, and further, that there was no proof that the LEOBR prevented the sheriff from taking disciplinary action against Deputy Falby. The court agreed, ruling that the State could argue that no action was taken after the Terron Williams incident

---

**14.** When proceedings continued on September 18, 2009, the State supplemented its earlier argument by citing additional case law, but the court again denied the motion.

because Deputy Falby did nothing wrong, but it could not argue that the State could not have taken any action because there was no LEOBR hearing.

The court instructed the jury on the elements of the claim of negligence as follows:

One dealing with the public is bound to use reasonable care and select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. An employer has a duty not to employ or retain any person who poses an unreasonable risk to other persons who would foreseeably come into contact with that employee because of the employment relationship. There is a rebuttable presumption that an employer has used due care in hiring an employee.

An employer who breaches this duty is responsible for any foreseeable injuries or damages caused by the conduct or actions of any such employee.

To establish a claim for negligence, the Plaintiff must prove the following:

1. the existence of an employment relationship;

2. the employee was incompetent and this incompetence posed an unreasonable threat to those members of the public as would foreseeably come into contact with the employee; although the exact harm or victim need not be foreseeable;

3. the employer's actual or constructive knowledge of such incompetence;

4. the employee's act or omission causing Plaintiff's injuries; and

5. the employer's negligence in retaining, training or supervising the employee being the proximate cause of Plaintiff's injuries.

In closing argument, Ms. Jones argued that the State improperly trained and supervised its officers, stating that the deputies were trained that they could enter apartments when there is no reasonable belief that the subject of an arrest

warrant is inside the premises, and that they were trained to use excessive force. She argued that Deputy Falby did not receive training that he should not improperly charge individuals, and that both deputies testified that everything that they did was pursuant to their training and supervision. With regard to the State's negligent retention, Ms. Jones argued that, after the Terron Williams incident, the State should have terminated Deputy Falby, moved him to a different position in the Department, or required him to attend additional training.

Ms. Jones argued that, as a result of the State's negligence, she incurred damages. Her physical injuries included a neck strain, black eye, and head injury. She was terminated from her position at Father Flanagan's, causing $35,000 in lost wages, and in her new job, she could no longer work overtime, causing her to make $5,000 less per year, a $15,000 loss of income she incurred over the past three years. She argued that, in addition to lost wages, she suffered the following economic damages: (1) loss of her vehicle, in which she had $10,000 equity, due to her failure to make payments; (2) loss of her Disney timeshare, in which she had $2,000 equity, due to her failure to make payments; (3) attorney's fees in connection with the charges Deputy Falby filed against her, totaling $1,000. Finally, Ms. Jones argued that she was entitled to damages for her pain, suffering, fear, and humiliation caused by the deputies' actions.

The jury returned a verdict in favor of Ms. Jones, finding the State liable for "negligent retention, supervision or training," and awarding $50,000 for lost wages, $11,000 for economic damages, and $200,000 in non-economic damages, a total of $261,000. The court stayed its entry of the judgment to allow the parties to submit legal memoranda on the issue of how to reconcile this damage award with the $5,000 non-economic damage award from the first trial.

In response, Ms. Jones agreed that judgment should be entered in the amount of $261,000. She stated that both juries awarded damages due to Deputy Falby's action in punching her in the face, and she acknowledged that she was

not entitled to the $5,000 damages award from the first trial in addition to the $261,000 damages award from the second trial. She argued that judgment should be entered in the amount of $261,000, which compensated her for the battery, as well as the injuries resulting from the State's negligence, which caused the loss of her ability to work with children, the suffering during her night in jail, and the fear associated with waiting for the outcome of the false charges.[15]

In its legal memoranda, the State argued that the court should enter judgment in the amount of $5,000. It argued, among other things, that because it had accepted liability, pursuant to the Maryland Torts Claim Act, for non-grossly negligent torts committed by state personnel within the scope of their employment, it was duplicative to hold the State liable for negligent retention or supervision of such personnel. Thus, the State argued that it was entitled to judgment as a matter of law. Alternatively it argued that, even if judgment on this claim was appropriate, the Maryland Torts Claim Act limited its liability to $200,000.

On October 6, 2009, the court ordered that judgment be entered in favor of Ms. Jones in the amount of $200,000. Additionally, it ordered that Ms. Jones' request for a new trial on Counts I through X be denied and "that the Judgment for Five Thousand Dollars ($5,000.00) mistakenly entered by the Clerk of the Court on April 7, 2009 contrary to the Order of Court dated March 26, 2009 staying entry of judgment be and hereby is vacated."

On October 16, 2009, the State filed a Motion and Memorandum in Support of Judgment Notwithstanding the Verdict. Initially, the State argued that it was "not liable for any negligent employment practice based upon the evidence admitted in this case," which it alleged showed merely

---

15. Ms. Jones additionally made a motion for new trial on Counts I through X, the Counts involved in the first trial. Because these arguments are not pertinent to the issues on appeal, we will not discuss them.

one prior unsubstantiated complaint against Deputy Falby and none against Deputy Henderson; no evidence at all regarding any lack of impropriety in supervision; and, to the extent that any evidence was admitted, training that is consistent with the requirements of the law, the Maryland Police Correctional Officers Training Commission, and of every law enforcement agency as to which evidence was offered.

The State further argued that,

because the State has already accepted direct liability for the only tort that the jury found either deputy to have committed ... holding the State liable for causing harm by acting negligently in its employment of these same deputies allows a duplicative recovery, is counter to the proper application of tort law, and effectively violates the immunity and limited waiver of the Maryland Tort Claims Act.

Finally, the State argued that "the Sheriff, and derivatively the State, is not liable for negligent employment practices absent proof of absolute malice, which the jury did not find."

On November 2, 2009, Ms. Jones filed her Opposition to the [State's] Motion for Judgment Notwithstanding the Verdict. She argued that there was "more than sufficient evidence for a rational jury to reach the verdict that it did," asserting that both deputies testified extensively regarding their wrongful acts, including Deputy Falby's testimony regarding the Terron Williams incident. Ms. Jones argued that both deputies "conceded that all of their actions were consistent with their training," and it was up to the jury to decide whether they believed that the deputies acted consistent with their testimony or with Ms. Jones' testimony. Moreover, she argued, the jury was free to infer from the evidence that the State was aware of Deputy Falby's prior incident.

Ms. Jones next argued that the verdict was not duplicative because negligent retention is a direct, independent cause of action. She asserted that "[w]hen a case is bifurcated for separate trials, it remains a single action, and the Court is required to reconcile the separate verdicts." She further

argued that the State was liable for the negligence of its employees, even without a showing of malice.

On November 16, 2009, the court denied the State's request for judgment notwithstanding the verdict. This timely appeal and cross-appeal followed.

## DISCUSSION

### Negligent Retention, Supervision, and Training

The State contends that the circuit court erred in denying its motion for judgment at trial and its motion for judgment notwithstanding the verdict ("JNOV") after trial.[16] It raises several arguments in this regard.

Initially, the State argues that Ms. Jones did not present sufficient evidence to support a claim for negligent retention, supervision, and training. It contends that Ms. Jones failed to show two requisite elements for a negligence action: (1) that it owed a duty to Ms. Jones; and (2) that it breached any duty. Additionally, the State asserts that the court erred "in entering judgment against the State in light of Ms. Jones' failure to present any evidence regarding negligent retention, training or supervision related to battery, the only tortious act the jury found either deputy committed." Finally, the State contends that the court erred in entering judgment against it in the second trial because the State had already accepted directly liability for Deputy Falby's alleged battery in the first trial.

Ms. Jones disputes these assertions. She urges this Court to affirm the jury's verdict, but she argues that the circuit court improperly reduced the verdict to a judgment of $200,000. Accordingly, she requests that we vacate the judgment and remand with instructions for the circuit court "to reinstate the jury's full damages award of $261,000."

---

16. This appeal involves solely the judgment entered after the second trial. It does not involve the jury's judgment in the first trial, finding Deputy Falby liable on the claim of battery.

We start with the State's contention that the court erred in denying its motions for judgment and JNOV. We have explained our standard of review in that regard as follows:

> On review of a motion for judgment in a civil negligence case, we ask whether on the evidence adduced, viewed in the light most favorable to the non-moving party, any reasonable trier of fact could find the elements of the tort by a preponderance of the evidence. If there is even a slight amount of evidence that would support a finding by the trier of fact in favor of the plaintiff, the motion for judgment should be denied.

*Washington Metro. Area Transit Auth. v. Djan*, 187 Md.App. 487, 491–92, 979 A.2d 194 (2009) (citations omitted). We review the denial of a motion for JNOV under the same standard as we review a denial of a motion for judgment. *Id.* at 491, 979 A.2d 194.

■ Ms. Jones' claims against the State in the second trial, the subject of this appeal, asserted that the State was negligent in its retention, supervision, and training of Deputies Falby and Henderson. To maintain an action in negligence, a plaintiff must allege facts demonstrating the following: " '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.' " *Horridge v. St. Mary's County Dep't of Soc. Serv.*, 382 Md. 170, 182, 854 A.2d 1232 (2004) (quoting *Remsburg v. Montgomery*, 376 Md. 568, 582, 831 A.2d 18 (2003)).

The State contends that Ms. Jones failed to satisfy these requirements. As indicated, it contends that she failed to show a duty or a breach of a duty that was a proximate cause of her alleged damages.

## A.

### Duty to Plaintiff

■ A crucial element of a negligence action is a showing that the defendant had a duty to protect the plaintiff from

injury. *Horridge*, 382 Md. at 182, 854 A.2d 1232. *Accord Muthukumarana v. Montgomery County*, 370 Md. 447, 486, 805 A.2d 372 (2002) ("The existence of 'a legally recognized duty owed by the defendant to the plaintiff . . . is vital to sustaining a cause of action in negligence.'" (quoting *Valentine v. On Target, Inc.*, 353 Md. 544, 549, 727 A.2d 947 (1999))). Duty has been defined as "'an obligation, to which the law will give recognition and effect, to conform a particular standard of conduct toward another.'"[17] *Horridge*, 382 Md. at 182, 854 A.2d 1232 (quoting *Remsburg*, 376 Md. at 582, 831 A.2d 18). Whether a legal duty exists is a question of law for the court to determine. *Muthukumarana*, 370 Md. at 486, 805 A.2d 372.

The State contends that Ms. Jones failed to make the requisite showing that it owed her any duty. It argues that, pursuant to the "public duty doctrine," the police have a duty to protect the public generally, not a duty to protect individual persons.

Ms. Jones argues that the public duty doctrine is inapplicable here because the doctrine involves the police duty to protect citizens from harm inflicted by another citizen, whereas this case involves injury inflicted by the police themselves, and the State's negligence in failing to properly train, supervise, and retain the police officers who caused the harm. She further argues that, even if the public duty doctrine applies, there is an exception to the doctrine where there is a "special relationship" between the police and the victim.

---

**17.** In determining whether a duty exists, the Court of Appeals has considered

"the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

*Horridge v. St. Mary's County Dep't of Soc. Serv.*, 382 Md. 170, 183, 854 A.2d 1232 (2004) (quoting *Remsburg v. Montgomery*, 376 Md. 568, 583, 831 A.2d 18 (2003))

The Court of Appeals has explained the public duty doctrine as follows:

Generally, under the public duty doctrine, when a statute or common law "imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort." As we explained in [*Ashburn v. Anne Arundel County*, 306 Md. 617, 628, 510 A.2d 1078 (1986)], the "duty owed by the police by virtue of their positions as officers is a duty to protect the public." Pursuant to the doctrine, therefore, police officers ordinarily may not be held liable for failure to protect specific persons because they owe no duty, as the first element of a negligence action requires, to those individuals.

*Muthukumarana*, 370 Md. at 486–87, 805 A.2d 372 (some citations omitted).

The Court explained the rationale for the public duty doctrine as follows:

[police] officials who act and react in the milieu of criminal activity where every decision to deploy law enforcement personnel is fraught with uncertainty must have broad discretion to proceed without fear of civil liability in the "unflinching discharge of their duties." . . . If the police were held to a duty enforceable by each individual member of the public, then every complaint—whether real, imagined, or frivolous would raise the spectre of civil liability for failure to respond. Rather than exercise reasoned discretion and evaluate each particular allegation on its own merits the police may well be pressured to make hasty arrests solely to eliminate the threat of personal prosecution by the putative victim.

*Id.* at 487 n. 26, 805 A.2d 372 (citations omitted).

The Court further explained:

Furthermore, [the public duty doctrine] acknowledges that "a policy which places a duty on a police officer to insure the safety of each member of the community would create an unnecessary burden on the judicial system." As the Dis-

trict of Columbia Court of Appeals explained [in *Morgan v. District of Columbia*, 468 A.2d 1306, 1311 (D.C.1983)], the application of the public duty doctrine to police officers recognizes that "juries and courts are ill-equipped to judge 'considered legislative-executive decisions' as to how particular community resources should be or should have been allocated to protect individual members of the public."

*Id.* (some citations omitted).

■■■ There is, however, an exception to the public duty doctrine, which allows an individual plaintiff to recover from a police officer if it is shown that a special relationship existed between the officer and the individual, such that a duty was owed to that individual separate from the general public. *Id.* at 487–88, 805 A.2d 372. A special relationship "'may be established in a number of ways: (1) by statute or rule; (2) by contractual or other private relationship; or (3) indirectly or impliedly by virtue of the relationship between the tortfeasor and the third party.'" *Ford v. Baltimore City Sheriff's Office*, 149 Md.App. 107, 131, 814 A.2d 127 (2002) (quoting *Bobo v. State*, 346 Md. 706, 715, 697 A.2d 1371 (1997)). In order for a duty to arise by virtue of a relationship between the police and an individual plaintiff, the plaintiff must show that "'the local government or the police officer affirmatively acted to protect the specific victim or specific group of individuals like the victim, thereby inducing the victim's specific reliance upon police protection.'" *Muthukumarana*, 370 Md. at 488, 805 A.2d 372 (quoting *Ashburn*, 306 Md. at 631, 510 A.2d 1078).

The State argues that the public duty doctrine applies to Ms. Jones' claim of negligent retention, training and supervision because "the State's responsibility, through the Sheriff, to train and supervise Deputies is owed to the public, not to individual citizens." Ms. Jones disagrees, contending that the public duty doctrine applies to a case against a police officer for failure to protect a citizen from injury caused by another citizen, but her claim is a direct claim against the State for

failing to properly train, supervise and retain the deputies.[18]

Alternatively, Ms. Jones argues that the State affirmatively created a special relationship with Ms. Jones "either through their placing [her] in custody" or through their having "placed Ms. Jones in a zone of danger when they unreasonably forced themselves into her home and repeatedly battered her without justification." The State asserts that there was no special relationship between the State and Ms. Jones because "the only conduct relevant to her claims is conduct that preceded the custodial relationship with Ms. Jones."

The Court of Appeals has suggested, consistent with Ms. Jones' argument, that the public duty doctrine protects the police from liability for failure to protect an individual "against injury caused by another citizen." *Ashburn,* 306 Md. at 628, 510 A.2d 1078. As the State points out, however, it has not held that the doctrine is limited to this situation. Other courts have been more specific and have expressly limited the public duty doctrine to claims involving the failure to protect individual citizens against harm from third persons, holding that the doctrine does not apply where the harm was brought about directly by the police. *See, e.g., Liser v. Smith,* 254 F.Supp.2d 89, 102 (D.D.C.2003) ("The claim that the government has no general duty to protect particular citizens from injury is simply a non-sequitur where the government itself is solely responsible for that injury, which it has caused by the allegedly negligent use of its own police powers."); *Bates v. Doria,* 150 Ill.App.3d 1025, 104 Ill.Dec. 191, 502 N.E.2d 454, 458 (1986) (public duty doctrine inapplicable to case "where plaintiff seeks to impose liability based upon the defendants' negligent employment of a law-enforcement officer, not upon defendants' failure to prevent the commission of crimes").

This Court, however, has applied the doctrine in a factual scenario similar to the facts of this case. In *Ford,* 149 Md.App. at 107, 814 A.2d 127, the plaintiff alleged that he was injured when the police mistakenly attempted to execute an

---

18. Ms. Jones contends that her negligence claim, "is not unlike any other police abuse claim against the State or a local government."

arrest warrant at his residence. *Id.* at 114–15, 814 A.2d 127. Ford filed a complaint against the deputy sheriffs and the Baltimore City Sheriff's Department, alleging, among other things, negligent training and supervision. *Id.* at 117, 814 A.2d 127. Specifically, Ford alleged that "the Sheriff's office negligently trained and supervised the deputies regarding the proper procedures for entering and searching a residence and detaining individuals." *Id.* at 128, 814 A.2d 127. In finding that Ford failed to establish a negligence claim, this Court addressed the public duty doctrine, noting:

> "We recognize the general rule, as do most courts, that absent a 'special relationship' between police and victim, liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers. Rather, the 'duty' owed by the police by virtue of their positions as officers is a duty to protect the public, and the breach of that duty is most properly actionable by the public in the form of criminal prosecution or administrative disposition."

*Id.* at 131, 814 A.2d 127 (quoting *Ashburn,* 306 Md. at 628, 510 A.2d 1078).

The Court went on to hold that the public duty doctrine prevented a claim for negligence, stating:

> In the instant case, appellant has wholly failed to establish why the State or the deputies owe a specific duty to him as an individual. Appellant makes bald allegations that the State and/or the deputies were negligent, but appellant has never alleged any special relationship that would establish that a duty was owed to him. Moreover, had appellant properly established that the deputies breached a duty to protect the public, it is apparent that such a breach would not sustain a negligence action against the officers or against the State for vicarious liability or negligent training or supervision. Instead, appellant should seek an administrative remedy.

*Id.*

Counsel for Ms. Jones candidly admitted at oral argument that it is difficult to distinguish *Ford* from the present case, at

least with respect to application of the public duty doctrine analysis to the claim of negligent supervision and training. Counsel did note, however, that *Ford* did not address the public duty doctrine as it pertains to a negligent retention claim. Counsel further argued that, despite *Ford,* the doctrine should be limited to situations where the police fail to protect a citizen from injury inflicted by another citizen.

We need not address in this case whether the State had any duty to Ms. Jones. Even if it had such a duty, we agree with the State that judgment should have been entered in its favor because Ms. Jones did not establish any breach of duty.

### B.

### Breach of Duty

The State contends that, "[e]ven if Ms. Jones were able to establish that the State, through the Sheriff of Prince George's County, owed a duty specifically to her, as opposed to the public generally, with respect to the retention, training or supervision of Deputies Falby and Henderson, her claim must fail because she failed to introduce evidence of . . . any breach of such a duty." Ms. Jones disagrees, arguing that "there was ample evidence before the jury" from which it could conclude that the State breached its duty.

### 1. Negligent Retention

An employer is obligated "to the public to use due care in selecting and retaining only competent and careful employees." *Henley v. Prince George's County,* 60 Md.App. 24, 36, 479 A.2d 1375 (1984), *rev'd in part on other grounds,* 305 Md. 320, 503 A.2d 1333 (1986). To establish a claim for negligent hiring and retention, the plaintiff must prove the following five elements:

(1) the existence of an employment relationship; the employee's incompetence;

(2) the employer's actual or constructive knowledge of such incompetence;

(3) the employee's act or omission causing the plaintiff's injuries; and

(4) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.

*Id.* (quoting 2 AM.JUR. PROOF OF FACTS 2d 609 § 2, 609, 615 (1974)). There is "a rebuttable presumption that an employer has used due care in hiring the employee." *Horridge,* 382 Md. at 181, 854 A.2d 1232.

The State argues that Ms. Jones failed to establish a claim for negligent retention. Specifically, it alleges: (1) Ms. Jones "did not even purport to present evidence" that Deputy Henderson was incompetent; (2) the evidence regarding Deputy Falby involved one incident, "as to which Deputy Falby's uncontroverted testimony was that he was completely exonerated"; and (3) there was no evidence of knowledge by a State official of improper behavior imposing a duty to fire him.[19] The State asserts that evidence of one single incident involving Deputy Falby "offered no evidentiary support for a claim that Deputy Falby even had a 'prior transgression,' much less one of which the State was aware."

Ms. Jones contends that there was ample evidence of the deputies' incompetence and the State's actual or constructive knowledge of this incompetence. In support, she states that the evidence at trial showed "that Deputy Falby previously punched a defenseless man in the face, that the State was on notice of his conduct, and that he was not disciplined, nor did

---

**19.** The State also argues that "as a matter of law, [it] not only had no duty to dismiss Deputy Falby as a result of the Te[r]ron Williams incident, but it could not have done so." It argues that, pursuant to the Law Enforcement Officer's Bill of Rights, *see* Md. Code (2003 Repl. Vol.), §§ 3 –102, –104, –107, –108 of the Public Safety Article, the Sheriff was precluded "from taking any disciplinary action against Deputy Falby in the absence of an adverse finding by a hearing board, which never occurred because the internal investigation had exonerated Deputy Falby." The circuit court prevented the State from making this argument to the jury because there was no evidence regarding an internal investigation. Accordingly, we will not consider this argument.

he receive any additional or different training as a result of the incident."

The Court of Appeals has made clear that a "critical standard" in a claim for negligent hiring/retention is "whether the employer knew or should have known that the individual was potentially dangerous." *Evans v. Morsell,* 284 Md. 160, 165, 395 A.2d 480 (1978). We agree with the State that Ms. Jones failed to present sufficient evidence to satisfy this standard. She failed to show that either Deputy Falby or Deputy Henderson was "unfit for the job, posing an unreasonable risk to those members of the public who would foreseeably come into contact with" them. *Henley,* 60 Md.App. at 37, 479 A.2d 1375. With respect to Deputy Henderson, Ms. Jones points to no evidence that would support such a claim. With regard to Deputy Falby, Ms. Jones points to a single incident where Deputy Falby punched a prisoner. The evidence showed that Deputy Falby punched this prisoner during an assignment where he was guarding approximately 50 prisoners who were being transported back to jail, and after the prisoner confronted another deputy and then shoved Deputy Falby. An internal investigation cleared Deputy Falby of all charges.

This evidence did not support a finding that Deputy Falby was unfit or incompetent, and therefore, it was insufficient to support a claim that the State was negligent in retaining him. The evidence did not come close to rebutting the presumption that the employer had used due care in hiring and retaining its employees. *See Horridge,* 382 Md. at 181, 854 A.2d 1232. *Accord Braswell v. Braswell,* 330 N.C. 363, 410 S.E.2d 897, 903 (1991) (burden on plaintiff to rebut presumption of due care and show employer negligent in employing or retaining incompetent servant after knowledge of incompetence). Because Ms. Jones failed to produce evidence that would permit the jury to find that the deputies were unfit, there was no evidence to support a finding of negligent retention. Under these circumstances, the circuit court erred in submitting this issue to the jury and in denying the State's motion for

judgment notwithstanding the verdict on Ms. Jones' claim of negligent retention.

## 2. Negligent Training and Supervision

 The State next argues that Ms. Jones failed to show any breach of duty with respect to the training or supervision of the deputies. It asserts that Ms. Jones "failed to introduce any evidence as to the standard of care for training or supervision of law enforcement officers and failed to offer any expert witness testimony to establish appropriate standards." Indeed, it asserts that "Ms. Jones failed to introduce evidence of any kind as to the Sheriff's actual training or supervision, much less evidence of deficiencies in that training or supervision."

The State asserts that the only testimony regarding training came from the deputies. It lists Deputy Falby's testimony as follows:

- he attended Prince George's County Police Academy for six months, where, among other things, he was trained in warrant service and the difference between a search warrant and an arrest warrant;
- he [was] provided in-service training on arrest procedures every year;
- in connection with serving subpoenas, he was trained that, when a door is opened to him, he should place his foot against the door to prevent it from closing, as a safety measure;
- he was trained in compliance measures;
- he was trained to notify a supervisor when he requests summonses regarding a case;
- he does not believe that anything he did in connection with the Jones incident was contrary to his training;
- the fact that he charged [Ms. Jones] with assaulting a law enforcement officer in spite of the fact that he was not injured resulted not from his training, but from his failure to read the full text of the charge; and

- he was trained that a citizen has a right to resist an unlawful arrest.

The State summarizes Deputy Henderson's testimony as follows:

- he attended Howard County Police Academy for six months, where he was trained in arrest procedures, warrant service and initiation of criminal proceedings; he is a certified police officer by the Maryland Police Training Commission; he attended a 6-week Experienced Police Officers Academy when he joined the Prince George's County Police Department; he had periodic in-service training at the Howard and Prince George's County Police Departments, and he now has periodic in-service training with the Prince George's County Sheriff's Department;

- he was trained not to let an open door close on him, which is for "an officer's safety," and;

- nothing he did or observed Deputy Falby doing in connection with the Jones incident violated his training, although a number of the things Ms. Jones accused them of doing would have violated his training if they had in fact happened.

Ms. Jones does not dispute the State's summary regarding the training of the deputies or suggest that there was any additional testimony. Rather, she contends that the deputies' testimony was sufficient to support her claim. She notes that the deputies testified that everything they did was consistent with their training. She asserts that the jury was free to believe Ms. Jones' version of events, and "[f]rom this evidence, the jury could find that the deputies were trained to unlawfully enter Ms. Jones' [ ] home, severely batter her, and falsely arrest and charge her."

In some jurisdictions, courts have held that expert testimony is necessary to maintain a claim of negligent training and supervision of police officers. For example, in *Cotton v. District of Columbia*, 541 F.Supp.2d 195, 207 (D.D.C.2008), the United States District Court for the District of Columbia stated that expert testimony is necessary where " 'the subject

matter is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson.'" *Id.* The court held that expert testimony was necessary for the claim of negligent training and supervision of police officers, stating: "Absent expert testimony on the standard of care relative to police training, the plaintiff cannot succeed on her claims because no jury could conclude that the District was negligent in training [the officer]." *Id. Accord Wilson ex rel. Manzano v. City of Jersey City,* 415 N.J.Super. 138, 1 A.3d 723, 740–41 (App.Div.2010) (dismissal of claim for negligent training, supervision or retention of 911 operators not an abuse of discretion when no expert testimony to establish the standard of care), *certification granted,* 205 N.J. 80, 12 A.3d 212 (2011); *Coll v. Johnson,* 161 Vt. 163, 636 A.2d 336, 339 (1993) (Issue of negligent training of police officer "could well require expert testimony inasmuch as the standard of care for the training of police officers is a technical subject not within the common knowledge of the average lay person.").

■■■ We agree that, in most cases, expert testimony regarding the standard of care regarding police training is necessary to support a claim of negligent training and supervision of police officers. Here, Ms. Jones failed to introduce any testimony, expert or otherwise, indicating that the training and supervision of Deputies Falby and Henderson was deficient. The only testimony regarding the training of the deputies was from the deputies themselves, and nothing in their testimony suggested that their training was inadequate or contrary to reasonable standards of police training. Under these circumstances, there was no evidence for the jury to find that the State was negligent in its training or supervision of the deputies. Accordingly, the circuit court erred in not granting judgment in favor of the State on this claim.[20]

---

**20.** Because we are reversing the judgment against the State, we need not address the claims raised in Ms. Jones' cross-appeal.

JUDGMENT REVERSED. COSTS TO BE PAID BY APPELLEE.

