38 A.3d 333

**Kimberly JONES**

v.

**STATE of Maryland, et al.**

**No. 37, Sept. Term, 2011.**

Court of Appeals of Maryland.

Feb. 22, 2012.

2

4

Cary J. Hansel (Joseph M. Creed of Joseph, Greenwald & Laake, P.A., Greenbelt, MD), on brief, for petitioner.

Matthew J. Fader, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., Baltimore, MD), on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

BARBERA, J.

This case has its genesis in an altercation between Kimberly Jones (hereafter "Petitioner") and two Prince George's County Deputy Sheriffs, Billy Falby and Gerald Henderson, during the deputies' attempt to serve an arrest warrant for an individual at the home of Petitioner. Petitioner filed a twelve-count complaint in the Circuit Court for Prince George's County, naming as defendants Deputies Falby and Henderson and their employer, the State of Maryland (hereafter "the State"), Respondent here. Among other allegations, Petitioner claimed that the State was negligent in its training of the two deputies in connection with the Fourth Amendment limitations on in-home execution of arrest warrants.

The counts of the complaint were bifurcated for trial and, at the second trial before a jury, the jury returned a verdict finding the State liable for the negligent training of the two deputies. The jury awarded Petitioner damages in the amount of $261,000, which the Circuit Court later reduced to

$200,000, pursuant to the Maryland Tort Claims Act. Both parties appealed the judgment.

The State raised numerous claims of error, including, pertinent here, that the trial judge erred in entering judgment against the State, because, in the words of the State: (1) "the State did not owe any duty . . . to Petitioner, as opposed to the public generally, with respect to the . . . training of Deputies Falby and Henderson"; and (2) Petitioner "failed to present evidence that the State owed a duty or breached a duty with respect to its . . . training of Deputies Falby and Henderson, and failed to present that any such breach was a proximate cause of her alleged damages." In connection with the latter claim, the State asserted that Petitioner was obligated to present expert evidence in support of her claim of negligent training.

The Court of Special Appeals reversed the judgment, agreeing with the State that the Circuit Court should have entered judgment in the State's favor because there was legally insufficient evidence that the State breached any duty to Petitioner in connection with the tort of negligent training and supervision. *State v. Jones,* 197 Md.App. 638, 674, 14 A.3d 1223, 1244 (2011). In light of that disposition, the Court of Special Appeals did not decide the remaining claims the parties raised in that court.

Petitioner filed a petition for writ of certiorari, which we granted, *Jones v. State,* 420 Md. 81, 21 A.3d 1063 (2011), to answer the following questions:

1. Does the public duty doctrine shield the State from a claim of negligence when its police officers commit intentional torts and/or constitutional violations?

2. Is expert testimony necessary for a plaintiff to meet her burden of proof on a claim of negligent training or supervision of police officers?

3. Is evidence that police officers committed intentional torts and constitutional violations, coupled with testimony by the officers that their actions were in accordance with their training, and evidence that the officers entered a

citizen's home without constitutionally sufficient justification sufficient to prove a claim of negligent training?

## I.

### Factual background

Each of the questions presented relates to the ultimate question of whether the Circuit Court properly denied the State's motions for judgment and judgment notwithstanding the verdict. Consequently, our factual summary is taken from the evidence presented at trial, cast in the light most favorable to Petitioner. *See Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 503, 16 A.3d 159, 163 (2011) ("An appellate court reviews the trial court's decision to allow or deny judgment or [judgment notwithstanding the verdict] to determine whether it was legally correct, while viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party." (Internal quotation marks and citations omitted)).

The events at issue took place on the morning of September 15, 2006, in and about the home of Petitioner, a one-bedroom apartment located at 151 Westway Center Drive, apartment number T–3, in Greenbelt, Maryland. At the time, Petitioner was asleep in bed, having returned home from working a midnight–to–8:00 a.m. shift as a "youth care worker II," at Father Flanagan's, an emergency shelter for teenage girls and boys. Petitioner, who was not wearing clothing at the time, awoke to someone knocking at her door. She called out "who is it?" and received the response, "it's the sheriff's department." Petitioner's immediate reaction was that there might be a fire or some other emergency, "because there would be no reason for a sheriff to knock at my door." [1]

---

1. It is undisputed that Deputies Falby and Henderson went to 151 Westway Center Drive to serve a domestic violence arrest warrant for Lamarr Wallace. Once at that location, the deputies realized that the address was for the apartment complex, without an apartment number listed. The deputies made a telephone call to the complainant to obtain

Petitioner called out "one moment," then went to her closet to retrieve a robe. She donned the robe, went to the door, and opened it. Two men, later identified as Deputy Sheriffs Falby and Henderson, were standing in front of the doorway. Petitioner did not recognize the men's attire as that of a law enforcement officer.[2]

Petitioner testified to what occurred next:

[A]s soon as I opened my door, this man put his foot in my door. It threw me back a little, and I said, what's going on? And he [later identified as Deputy Falby] asked for Lamarr Wallace. I said, no, Lamarr Wallace don't live here. He said, can we come [in] and check. I said no, because I'm not dressed. He said well, we coming in whether you like it or not. I said, what do you mean? By then, the second person [later identified as Deputy Henderson] left, and I said, well, where is your warrant? He said, I don't have my warrant. My supervisor has my warrant. I said, where is your supervisor? And by then somebody was tapping at my patio door.

So when I turned to look at the patio door, that's when I saw the man tapping on the door. When I turned back, Falby hit me.

Petitioner added that Deputy Falby did not ask permission to enter; indeed, he said nothing before putting his foot through the door opening.

The "hit" Petitioner received from Deputy Falby was a close-fisted punch to her face, which knocked her against a closet door behind her. At the same time, Deputy Henderson pulled out his baton and shattered the glass patio door in order to enter the apartment. Petitioner, unfamiliar with the

---

the apartment number, and as a result of that call went to Petitioner's apartment.

2. Deputy Falby testified that he and Deputy Henderson were not dressed in traditional uniforms that morning, but were wearing "Battle Dress Uniforms." The uniforms were described as "dark blue" with "baggy cargo pants," modeled after current-issue United States military uniforms.

deputies' style of dress and never having encountered such behavior from law enforcement officers before, "truly didn't believe that they were police officers." She thought the men were criminals posing as sheriff's deputies. She therefore began to struggle against the two men in an attempt to escape the apartment.

Petitioner testified that she was sprayed with pepper spray, beaten with a baton, and had a portion of hair pulled from her scalp. Eventually Petitioner broke free, ran through the front doorway and into an adjoining hallway. She knocked on the doors of the residential units around her and called out for help. Temporarily blinded by the pepper spray, she eventually began to knock on the door of her own apartment where, for a second time, she encountered the two deputies. During that encounter, one or the other of the deputies again sprayed Petitioner and struck her on the forearm with a baton.

Petitioner ran from the doorway of her apartment, through the hallway, and into the surrounding parking lot. Deputies Falby and Henderson caught up with her there. They subdued and arrested Petitioner by "jerk[ing]" her arms behind her back and "bang[ing]" her head against a car. The deputies then helped Petitioner clean some of the pepper spray from her skin and retrieved clothes from her apartment for her to wear. Petitioner was made to change into those clothes in the parking lot, in full view of her neighbors.

The deputies escorted Petitioner to a hospital for "decontaminat[ion]" from the pepper spray, then transported her to jail and charged her with, *inter alia,* assault on a law enforcement officer and resisting arrest. The charges were nol prossed after neither deputy appeared for trial. Nevertheless, Petitioner lost her job at the emergency youth shelter because the charges appeared on her annual criminal background check.

### *The lawsuit*

On November 27, 2007, Petitioner filed a complaint in the Circuit Court for Prince George's County, naming as defendants Deputies Falby and Henderson and the State of Mary-

land. She pleaded ten counts arising from the altercation, including: (1) violation of Maryland Declaration of Rights, Article 26; (2) violation of Maryland Declaration of Rights, Article 24; (3) false arrest; (4) trespass to land; (5) trespass to chattel/trover and conversion; (6) false imprisonment; (7) battery; (8) malicious prosecution; (9) intentional infliction of emotional distress; and (10) civil conspiracy. After a period of discovery, during which Petitioner deposed both deputies, Petitioner amended the complaint to add two more counts: (11) negligent retention; and (12) negligent training and supervision, the count at the heart of the instant appeal. With regard to the claim of negligent training and supervision, Petitioner alleged that the "State has a duty to individuals such as [Petitioner] to properly train and supervise officers such that they do not violate the rights of citizens"; the State breached that duty by "failing and refusing to properly train and supervise" Deputies Falby and Henderson; the deputies "were trained that they may forcibly enter a person's home without a search warrant in order to serve an arrest warrant for someone who does not live there"; and, as a result, the deputies "committed the other wrongs alleged in this case," directly and proximately causing injury to Petitioner.

The State answered the amended complaint, generally denying liability on multiple grounds. The State filed a Motion for Partial Summary Judgment asserting, in connection with the claim of negligent training and supervision, that Petitioner could not establish the claim as a matter of law. The State argued that the deputies' training was consistent with Fourth Amendment standards; therefore, the State did not breach any applicable duty. The State further argued that, even if Petitioner could show a breach, the State's duty to train the deputies in constitutionally permissible arrest procedures was a duty owed to the public, not to Petitioner as an individual. In the State's view, its public duty to provide proper training for its deputies did not provide a basis for tort liability grounded in negligence. The Circuit Court denied the Motion for Partial Summary Judgment.

Trial commenced on all twelve counts of the complaint. During trial, the court found it necessary for evidentiary reasons to sever Counts XI (alleging negligent retention) and XII (alleging negligent training and supervision) from the remaining counts. Trial went forward on Counts I through X, and, at its conclusion, the jury found in favor of Deputy Henderson on all counts, and in favor of Deputy Falby and the State on all counts except the battery claim. On the battery claim, the jury found in favor of Petitioner and awarded her $5,000 in non-economic damages.

On September 14, 2009, trial commenced on the counts alleging negligent retention, supervision and training. Petitioner's testimony was as we have summarized it. Petitioner also had read into the record a transcript of the testimony of Angela Bolder, who had testified at the first trial but was unavailable to testify at the second. Ms. Bolder testified that, on September 15, 2006, she lived in the apartment next door to Petitioner. Ms. Bolder heard Petitioner in the hallway screaming: "Help me. Can you help me. Can you help me." When Ms. Bolder looked through the peep hole in her front door, she saw that a man had Petitioner pressed against the hallway wall and hit her with a "stick." Ms. Bolder called 911 because she could not tell that the man, who was wearing dark clothing, was a police officer.

Petitioner also called Sandra Frye, a childhood friend. Ms. Frye testified that Lamarr Wallace is her brother and was living with her at the time in question. Ms. Frye testified that she picked up Petitioner upon her release from jail the day following the incident. At that time, Petitioner had a black eye and a bald spot on the back of her head. The two women went to Petitioner's apartment, where they noticed hair on the floor. Ms. Frye used her cell phone camera to take digital photographs of Petitioner's head.

Petitioner called both Deputies Falby and Henderson to testify about the training they received in connection with serving arrest warrants. Deputy Falby confirmed that he had attended the police academy, attended annual in-service train-

ing seminars, and obtained yearly re-certification for all his policing qualifications. Deputy Falby testified that the Sheriff's Office alone was responsible for keeping him apprised of the legal standards associated with his job, including those Fourth Amendment standards that govern search and arrest procedures. Deputy Falby testified, in particular, about the training he received in connection with the authority to enter a home in order to arrest an individual within:

[Petitioner's Counsel]: According to your training, you have been taught there's a difference between a search and arrest warrant; isn't that right?

[Deputy Falby]: Correct.

[Petitioner's Counsel]: It's a search warrant that allows you to go into someone's home even if the subject of an arrest warrant isn't there; isn't that right?

[Deputy Falby]: Arrest warrant, as well, allows me that.

[Petitioner's Counsel]: So your training is that if you have an arrest warrant, you can go into someone's home even without believing that the subject of the arrest is in the house?

[Deputy Falby]: Believing that he is in the house.

[Petitioner's Counsel]: Even without believing he's in the house?

[Deputy Falby]: No.

[Petitioner's Counsel]: And according to your training, if you have just an arrest warrant, not a search warrant, just an arrest warrant, you can enter a home without permission?

[Deputy Falby]: If I believe the subject is there and the address on the arrest warrant is the address that I'm at, correct.

[Petitioner's Counsel]: Were you also trained regarding the constitutional rights of citizens?

[Deputy Falby]: Yes.

\* \* \*

[Petitioner's Counsel]: According to your training, does the house that you're going to enter have to be the home of the actual arrestee?

[Deputy Falby]: No. The warrant has an address on it, and that's the address we normally go to that's on the warrant.

[Petitioner's Counsel]: And that's what you've been trained to do, right?

[Deputy Falby]: Correct.

[Petitioner's Counsel]: Go to the address on the warrant?

[Deputy Falby]: Correct.

[Petitioner's Counsel]: Even if it's not the address where the actual arrestee is?

[Deputy Falby]: We're assuming that's where he lives.

[Petitioner's Counsel]: But you haven't been trained or taught, as he said, to only go to the house of the arrestee?

[Deputy Falby]: Well, the address on the warrant, sir.

[Petitioner's Counsel]: Just the warrant?

[Deputy Falby]: Yes, sir.

Deputy Falby also testified about the training he received in connection with the act of placing his foot in the doorway of a home during an arrest encounter:

[Petitioner's Counsel]: Your understanding of your training is you've been trained to do that, to block the door from being closed immediately by broaching it with your leg?

[Deputy Falby]: Right. We don't let the door close once it's opened, correct.

[Petitioner's Counsel]: You've been trained to do that. Door opens, your leg goes in?

[Deputy Falby]: Right. Once we're in the process of arresting someone or believe they're inside, yes.

Deputy Henderson's testimony was to like effect. He testified that he attended the police academy and regularly attended in-service training and certification-requirement seminars. He also testified that all that was "necessary" for him to enter a home on the authority of an arrest warrant was "[r]eason-

able suspicion and belief that the suspect [was] inside." He added that, according to his understanding of his training, placing a foot in a doorway during an arrest was for officer safety reasons.

The State moved for judgment at the close of Petitioner's case, arguing, pursuant to the "public duty doctrine," that the State owed no specific duty to Petitioner and, even so, there was no evidence of a breach of any duty owed Petitioner. In connection with the latter argument, the State contended that Petitioner had failed: (1) to present expert testimony to show that the deputies' training deviated from generally acceptable training standards, as is usually required in professional negligence cases; and (2) to introduce sufficient evidence showing the unconstitutionality of the deputies' training. The court, viewing the evidence in the light most favorable to Petitioner, denied the motion. The State rested without offering any witnesses, then renewed its motion for judgment. The State remade the arguments presented at the close of Petitioner's case, adding that the State was not on any notice such that it could be held liable in tort for any wrongdoing by either deputy. The court denied the motion.

The court instructed the jury, in pertinent part:

There is a constitutional right to be free from intrusion into one's home by the police. However, police officers in possession of an arrest warrant, founded on probable cause, possess the limited authority to enter a suspect's residence when the officers reasonably believe the suspect is within the residence. Before an officer can enter a residence, the officer must reasonably believe both that it is the residence of the person named in the warrant and that the person is within the residence. A law enforcement officer's belief that the warrant suspect resides at the dwelling must be objectively reasonable in view of the totality of the circumstances at the time of the entry, even if the officer's belief ultimately proves to be wrong.

The Circuit Court, reasoning that Counts XI and XII addressed several aspects of what is a single tort, that of

negligent retention, training or supervision, included on the verdict sheet only one question as to liability: "Do you find Defendant, State of Maryland, is liable for negligent retention, supervision or training of Bill Falby or Gerald Henderson as employees?"[3] The jury, answering that question "yes," awarded Petitioner $50,000 in lost wages, $11,000 in other economic damages, and $200,000 in non-economic damages. The Circuit Court reduced the total award to $200,000, pursuant to the Maryland Tort Claims Act.

The State filed a motion for judgment notwithstanding the verdict, raising the same arguments as were pressed in the motions for judgment. The court denied the motion.

On appeal to the Court of Special Appeals,[4] the State challenged the legal viability of Petitioner's negligence claim on, among others, the three grounds it had argued in the Circuit Court. The Court agreed with the State that Petitioner submitted insufficient evidence to prevail on her claim. *Jones*, 197 Md.App. at 674, 14 A.3d at 1244. The Court initially noted that the State's public duty argument "ha[d] been] applied . . . in a factual scenario similar to the facts of [Petitioner's] case." *Id.* at 667, 14 A.3d at 1240 (citing *Ford v. Balt. City Sheriff's Office*, 149 Md.App. 107, 814 A.2d 127 (2002)). The Court, however, declined to decide the issue, reasoning that, "[e]ven if [the State] had such a duty, . . . Ms.

---

3. At some point before the jury retired to deliberate, the court and parties had discussed whether Petitioner's claims comprised but a single cause of action in negligence or three separate causes of action. Petitioner took the position that she had pleaded three torts—negligent retention; negligent training; and negligent supervision—and therefore the three claims should be presented separately to the jury. For its part, the State viewed the three claims as addressing separate aspects of a single cause of action and therefore only a single question should be presented. The Circuit Court agreed with the State and included on the verdict sheet the one question, quoted above, on the issue of liability. Petitioner does not contend that the court erred in sending the single question to the jury, and we offer no comment on the subject.

4. Petitioner cross-appealed the Circuit Court's reduction of the damages award. Because the Court of Special Appeals reversed the judgment of liability, it did not address Petitioner's cross-appeal. Petitioner has not pursued that issue here.

Jones did not establish any breach of duty." *Id.* at 669, 14 A.3d at 1241. The Court focused on whether Petitioner had presented legally sufficient evidence that the State had breached the standard of care in connection with the training of Deputies Falby and Henderson. *Id.* at 672–74, 14 A.3d at 1242–44. The Court noted that, "in most cases, expert testimony regarding the standard of care regarding police training is necessary to support a claim of negligent training and supervision of police officers." *Id.* at 674, 14 A.3d at 1244. And, because Petitioner failed to introduce testimony, "expert or otherwise, indicating that the training and supervision of Deputies Falby and Henderson was deficient," there was, necessarily, "no evidence for the jury to find that the State was negligent in its training or supervision of the deputies." *Id.*, 14 A.3d at 1244. For that reason, the Court of Special Appeals reversed the judgment of the Circuit Court, prompting Petitioner's successful petition to this Court.

## II.

The three questions Petitioner presents for our consideration all relate, in one way or another, to the overarching question of whether the Circuit Court correctly denied the State's motions for judgment and for judgment notwithstanding the verdict. Petitioner asks us to decide in her favor: (1) whether the "public duty" doctrine shields the State from Petitioner's claim of negligent training of Deputies Falby and Henderson; (2) whether Petitioner was required to present expert testimony on that negligence claim; and (3) whether she presented legally sufficient evidence that the State was negligent in training Deputies Falby and Henderson on the constitutional rules respecting in-home execution of arrest warrants.

We shall address each of those questions. We begin, though, with a brief summary of the tort of negligent selection, training, or retention. We recognized more than 100 years ago that

an employer owes a duty *to its employees* to use "reasonable care and caution in the selection of competent fellow servants, and in the retention in his service of none but those who are," and that, if the employer fails in that duty and "an injury is occasioned by the negligence of an incompetent or careless servant," the employer is liable *to the injured employee* "not for the mere negligent act or omission of the incompetent or careless servant, but for his own negligence in not discharging his own duty towards the injured servant."

*Horridge v. St. Mary's County Dep't of Soc. Servs.*, 382 Md. 170, 180, 854 A.2d 1232, 1237 (2004) (quoting *Norfolk & Western R. Co. v. Hoover,* 79 Md. 253, 29 A. 994 (1894)) (emphasis supplied in Horridge). Later, in *Evans v. Morsell,* 284 Md. 160, 395 A.2d 480 (1978), we "extended that duty, and liability, to the public generally—not just to co-employees—at least with respect to the selection of employees who were expected to have contact with the public." *Horridge,* 382 Md. at 180, 854 A.2d at 1237 (citing *Evans,* 284 Md. at 166–67, 395 A.2d at 483–84). The tort reflects the notion that, "where an employee is expected to come into contact with the public[,] . . . the employer must make some reasonable inquiry before hiring or retaining the employee to ascertain his fitness, or the employer must otherwise have some basis for believing that he can rely on the employee." *Id.* at 181, 854 A.2d at 1237–38 (quoting *Evans,* 284 Md. at 166–67, 395 A.2d at 483). Moreover, the tort of negligent selection, training, or retention, like any negligence action, requires the plaintiff to prove the existence of four elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury; and (4) the injury proximately resulted from the defendant's breach. *Id.* at 182, 854 A.2d at 1238.

Petitioner's current focus with regard to her negligence claim is that the State was negligent in training Deputies Falby and Henderson to violate Fourth Amendment law. Therefore we shall address the issues Petitioner has presented within the context of the specific claim of negligent training.

### A. Applicability of the public duty doctrine?

■ The parties dispute the applicability of the so-called "public duty doctrine" to Petitioner's claim of negligent training. The question is a threshold one, for, if the doctrine applies to the present case, then the State owed no duty to Petitioner, and, thus, the negligence claim fails at the outset. As we consider this issue, we bear in mind that, ordinarily, in a negligence action, whether the defendant owed a duty to the plaintiff is a question of law, to be decided by the court. *McNack v. State*, 398 Md. 378, 395, 920 A.2d 1097, 1107 (2007).

■ Establishment of a legal duty is a prerequisite to a claim of negligence because "[t]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another." *Id.*, 920 A.2d at 1106 (citations and internal quotation marks omitted). " 'Duty' in negligence has been defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Muthukumarana v. Montgomery County*, 370 Md. 447, 486, 805 A.2d 372, 395 (2002) (citation and some internal quotation marks omitted). In determining whether a duty exists, we have considered, among other factors, " 'the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties.' " [5] *Horridge*, 382 Md. at 183, 854 A.2d at 1239 (quoting *Jacques v. First Nat'l Bank*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986)).

---

5. These two factors represent a consolidation of factors that we have considered in determining the existence (or not) of a duty owed by the defendant to the plaintiff. Those factors include:

the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Horridge v. St. Mary's County Dept. of Soc. Servs.*, 382 Md. 170, 183, 854 A.2d 1232, 1238 (2004) (quoting *Remsburg v. Montgomery*, 376 Md. 568, 583, 831 A.2d 18, 26 (2003)).

The State raised the public duty doctrine as a defense to Petitioner's negligent training claim. The doctrine provides that, "when a statute or common law 'imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort.'" *Muthukumarana*, 370 Md. at 486, 805 A.2d at 395 (quoting Dan B. Dobbs, *The Law of Torts* § 271 (2000)). The public duty doctrine "define[s] the scope of the tort duty owed by police officers to persons in need of assistance." *Muthukumarana*, 370 Md. at 486, 805 A.2d at 395; *accord Ashburn v. Anne Arundel County*, 306 Md. 617, 628, 510 A.2d 1078, 1084 (1986) (explaining that the "'[d]uty' owed by the police by virtue of their positions as officers is a duty to protect the public"). In keeping with that doctrine, "police officers ordinarily may not be held liable for failure to protect specific persons because they owe no duty, as the first element of a negligence action requires, to those individuals." *Muthukumarana*, 370 Md. at 486–87, 805 A.2d at 395.

*Ashburn* is perhaps the lead case in Maryland addressing the duty that police officers owe to the public. In that case, an Anne Arundel County police officer encountered a person in a parking lot sitting behind the wheel of a vehicle, with its engine running. *Ashburn*, 306 Md. at 619, 510 A.2d at 1079. It was undisputed that the individual was intoxicated and could have been charged with driving while intoxicated. *Id.* at 619–20, 510 A.2d at 1079. The officer did not arrest the individual, but instead ordered him to park the car and not drive until the next day. *Id.* at 620, 510 A.2d at 1079. The officer then left the scene. *Id.*, 510 A.2d at 1079. The driver later drove from the parking lot and struck a pedestrian, who was seriously injured. *Id.*, 510 A.2d at 1079. The pedestrian sued the officer, the Anne Arundel County Police Department, and Anne Arundel County, on the theory that the police had a mandatory duty under state law to detain all intoxicated drivers. *Id.*, 510 A.2d at 1079. The Circuit Court dismissed the suit in part because the defendants owed no special duty to the pedestrian. *Id.*, 510 A.2d at 1079. This Court affirmed. *Id.* at 635, 510 A.2d at 1087.

We noted at the outset that the police officer had made a discretionary decision not to arrest the individual but instead to order him not to drive until the following day. *Id.* at 626, 510 A.2d at 1083. We then defined the duty "owed by the police by virtue of their positions as officers" as "a duty to protect the public." *Id.* at 628, 510 A.2d at 1084. We explained why the general duty to protect the public, without more, does not create a duty owed to a specific individual:

[P]ublic officials who act and react in the milieu of criminal activity where every decision to deploy law enforcement personnel is fraught with uncertainty must have broad discretion to proceed without fear of civil liability in the unflinching discharge of their duties.... [T]he public interest is not served by allowing a jury of lay (persons) with the benefit of 20/20 hindsight to second-guess the exercise of a police [officer]'s discretionary professional duty. Such discretion is no discretion at all.

[I]f the police were held to a duty enforceable by each individual member of the public, then every complaint—whether real, imagined, or frivolous [—] would raise the spectre of civil liability for failure to respond. Rather than exercise reasoned discretion and evaluate each particular allegation on its own merits the police may well be pressured to make hasty arrests solely to eliminate the threat of personal prosecution by the putative victims. Such a result historically has been viewed, and rightly so, as untenable, unworkable and unwise.

Furthermore, a policy which places a duty on a police officer to insure the safety of each member of the community would create an unnecessary burden on the judicial system. Under such circumstances, the slightest error of a policeman would give rise to a potential lawsuit.

*Id.*, at 629–30, 510 A.2d at 1084 (citations and quotation marks omitted) (some alterations in original).

We have recognized the policy undergirding the public duty doctrine and applied the doctrine in a number of cases, albeit in some of them without specific reference to the doctrine, as

such. E.g., *McNack*, 398 Md. at 403, 920 A.2d at 1111 (holding that neither the State nor Baltimore City was liable for failure to protect plaintiff from drug dealers firebombing plaintiff's home because no special relationship existed between the State, or the City, and the plaintiff, and, thus, the public duty doctrine applied); *Muthukumarana*, 370 Md. at 490, 805 A.2d at 397 (holding that allegedly-negligent 911 employees were not liable to victims who had contacted them, including the family of a young girl killed by her friends and a woman whose husband shot her and her children, because "it [was] appropriate to measure [the employee's] negligence liability ... by the same standard applied to police officers," and the employees "by virtue of their position ... [owed] a public duty to aid," and were thereby shielded by the public duty doctrine); *Boyer v. State*, 323 Md. 558, 577–78, 594 A.2d 121, 130–31 (1991) (holding, in part, that the public duty doctrine shielded both the State and a law enforcement officer from the officer's allegedly negligent discretionary decision not to apprehend immediately a drunk driver who thereafter, during a high-speed chase, struck and killed two motorists); *cf. Williams v. Mayor of Baltimore*, 359 Md. 101, 151, 753 A.2d 41, 68 (2000) (holding that the trial court's grant of summary judgment was improper because a dispute of material facts—whether the defendant officer told one of the plaintiffs that he would remain outside her home to protect her— determined the existence of a special protective relationship between law enforcement and plaintiffs; noting, though, that, if those facts proved true, and the officer had made such a promise, then the public duty doctrine would not have shielded the law enforcement officer from liability for failing to protect plaintiffs from an attack by one plaintiff's murderous boyfriend).

We also have recognized that the public duty doctrine "is not without its limitations." *Muthukumarana*, 370 Md. at 487, 805 A.2d at 396. The doctrine does not apply, for example, "when the court concludes that a statute or court order has created a *special duty* or specific obligation to a particular class of persons rather than to the public at large."

*Id.,* 805 A.2d at 396 (quoting Dobbs, *supra* § 271). We have made clear that, in order for a special relationship between law enforcement and an individual or class of persons to be found, it must "be shown that the local government or the police officer affirmatively acted to protect the specific victim or specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection." *Id.* at 488, 805 A.2d at 396 (quoting *Ashburn,* 306 Md. at 631, 510 A.2d at 1085).

█ Petitioner does not claim that a statute or court order has created a specific obligation the State owed her in connection with the events at issue. Rather, she argues that the public duty doctrine simply has no applicability when law enforcement is not engaging in the role of protecting citizens from private harms. That argument finds support in *Ashburn,* as we stated there that the public duty doctrine protects law enforcement from liability for failure to protect an individual "against injury caused by another citizen." *Ashburn,* 306 Md. at 628, 510 A.2d at 1083. As far as we can discern, though, we have not yet directly decided [6] whether the doctrine applies to situations like the present one. Other courts, however, have done so, and we find the reasoning of those courts persuasive.

*Strickland v. Univ. of N.C. at Wilmington,* —— N.C.App. ——, 712 S.E.2d 888 (2011), *review denied,* —— N.C. ——, 720

---

6. We note here *Ford v. Balt. City Sheriff's Office,* 149 Md.App. 107, 814 A.2d 127 (2002), in which the Court of Special Appeals relied on our opinion in *Bobo v. State,* 346 Md. 706, 697 A.2d 1371 (1997), for the proposition that, absent a special relationship, the State owes no duty in tort to a person wrongfully detained by an expired or invalid warrant. *Bobo,* however, does not address specifically the contours of the public duty doctrine. In *Bobo,* we merely concluded that the plaintiff, in his pleadings, "fail[ed] to employ any ... means to demonstrate a duty on the part of court personnel to recall [an arrest] warrant." 346 Md. at 715, 697 A.2d at 1376. We therefore held that the plaintiff's complaint was deficient, because it "failed to identify the source from which such a duty arose," and thus "the trial court properly dismissed [the plaintiff]'s case." *Id.* at 715–16, 697 A.2d at 1376. At no point does our opinion mention, much less discuss, the public duty issue raised here.

S.E.2d 677 (2012), provides an example. In *Strickland,* the plaintiff was mistakenly killed by local law enforcement officers who were trying to serve an arrest warrant when one of the officers, mistaking the sound of a battering ram hitting a door for a gunshot, fired his weapon into the plaintiff's residence. 712 S.E.2d at 889. A subsequent suit for the plaintiff's wrongful death claimed that the State "negligently provided false, misleading, and irrelevant information to [the law enforcement officers] ... serving [the plaintiff]'s arrest warrant," which "le[d] [the officers] to believe that they were entering into ... a 'severely dangerous environment including heavily armed suspects with histories of intentional physical violence causing injuries to persons.'" *Id.* In its defense, the State argued that the public duty doctrine precluded liability because the State's duty to provide accurate information to its officers was one "owed to the general public." *Id.* at 892. The Court of Appeals of North Carolina disagreed, holding that the duty to provide accurate information was not a public duty, and the associated duty to conduct non-negligent investigations "[did] not resemble the type[ ] of dut[y] to the general public for which the public duty doctrine normally precludes liability." *Id.* The court explained that, "[i]n all cases where the public duty doctrine has been held applicable, the breach of the alleged duty has involved the governmental entity's negligent control of an external injurious force or of the effects of such a force." *Id.*

Other courts are to like effect. *Liser v. Smith,* 254 F.Supp.2d 89, 102 (D.D.C.2003) ("[The public duty doctrine] is wholly inapposite in a case such as this, where the alleged harm was brought about directly by the officers themselves, and where there is no allegation of a failure to protect. The claim that the government has no general duty to protect particular citizens from injury is simply a non-sequitur where the government itself is solely responsible for that injury, which it has caused by the allegedly negligent use of its own police powers.") (citation omitted); *District of Columbia v. Evans,* 644 A.2d 1008, 1017 n. 8 (D.C.1994) ("In this case, the harm ... was caused directly by the officers at the scene.

There is no allegation of failure to protect. The public duty doctrine, therefore, has no relevance to this case."); *Bates v. Doria*, 150 Ill.App.3d 1025, 104 Ill.Dec. 191, 502 N.E.2d 454, 458 (1986) ("The public duty doctrine is inapplicable to the present case where plaintiff seeks to impose liability based upon the defendants' negligent employment of a law enforcement officer [who allegedly raped and assaulted the plaintiff], not upon defendants' failure to prevent the commission of crimes.").

The reasoning of these cases is sound and, we believe, wholly consistent with the policy considerations that undergird Maryland's public duty doctrine. Those policy considerations we quoted above from *Ashburn* and restated in other cases, *e.g., McNack*, 398 Md. at 397–98, 920 A.2d at 1108, and *Muthukumarana*, 370 Md. at 487 n. 26, 805 A.2d at 395–96 n. 26, are not present in situations in which, as here, the law enforcement officers are not called upon to react quickly and with "reasoned discretion," and therefore are not susceptible to post hoc review by lay juries. *Muthukumarana*, 370 Md. at 487 n. 26, 805 A.2d at 395–96 n. 26. Nor, for that matter, does the situation we confront in the present case call upon us (or, previously, the fact-finder) to "judge considered legislative-executive decisions as to how particular community resources should be or should have been allocated to protect individual members of the public." *Id.*, 805 A.2d at 396 n. 26 (quotation mark and citation omitted). None of these policy considerations is implicated in circumstances like the present one, in which a plaintiff seeks to impose liability based upon the State's negligent training of its law enforcement agents, as opposed to the State's failure to prevent the infliction of harm by one "lay" person to another.

■ We therefore join our sister jurisdictions that recognize the public duty doctrine does not apply if law enforcement is not engaged in protecting the public from an injurious force caused by a member of the public, but rather is itself the alleged injurious force. Petitioner's claim of negligent training does not allege harm resulting from an external injurious

force, but rather alleges harm from the State's negligent training of Deputies Falby and Henderson in what were alleged to be unconstitutional arrest procedures. The public duty doctrine does not foreclose liability on that claim.

### B. Expert testimony establishing a standard of care

The State argued to the trial court that Petitioner's claim for negligent training fails for lack of expert testimony establishing a standard of care. The trial court disagreed. So do we.

To be sure, "[w]here the plaintiff alleges negligence by a professional, expert testimony is generally necessary to establish the requisite standard of care owed by the professional." *Schultz v. Bank of Am.*, 413 Md. 15, 28, 990 A.2d 1078, 1086 (2010). The rule, derived to a large degree from medical malpractice cases, *see Rodriguez v. Clarke*, 400 Md. 39, 71, 926 A.2d 736, 755 (2007) (and cases cited therein), is that experts are usually necessary to explain professional standards because such standards require specialized knowledge within the professional's field that are generally "beyond the ken of the average layman," *id.*, 990 A.2d at 1086 (quoting *Bean v. Dep't of Health*, 406 Md. 419, 432, 959 A.2d 778, 786 (2008)). If the plaintiff presents no expert when one is needed, then the trial court "may rule, in its general power to pass upon the sufficiency of the evidence, that there is not sufficient evidence to go [to] the jury." *Rodriguez*, 400 Md. at 71, 926 A.2d at 755 (quoting *Fink v. Steele*, 166 Md. 354, 361, 171 A. 49, 52 (1934)).

We have emphasized, though, that experts are not needed when "the alleged negligence is so obvious that the trier of fact could easily recognize that such actions would violate the applicable standard of care." *Schultz*, 413 Md. at 29, 990 A.2d at 1087; *see, e.g., Thomas v. Corso*, 265 Md. 84, 99, 288 A.2d 379, 388 (1972) (requiring no expert testimony to establish the standard of care in a medical malpractice case where the alleged breach was the failure of an emergency room attending physician to personally observe and treat a

severely injured patient after the patient was struck by a car and brought to the hospital); *Cent. Cab Co., Inc. v. Clarke*, 259 Md. 542, 551, 270 A.2d 662, 667 (1970) (requiring no expert testimony to establish the standard of care in a legal malpractice case when the alleged breach was a lawyer's failure to inform his client that he was terminating representation). If a jury can use its "common knowledge or experience" to recognize a breach of a duty, then expert testimony is unnecessary to calibrate the exact standard of care owed by the defendant. *Cent. Cab Co.* 259 Md. at 551, 270 A.2d at 667 (quoting *Butts v. Watts*, 290 S.W.2d 777, 779 (Ky.1956)).

In this instance, the standard of care is established by the Fourth Amendment to the Constitution of the United States [7] and the judicial gloss placed upon it by the Supreme Court that must be followed in Maryland. No expert was needed to testify about the relevant constitutionally-based standard, for that standard could be, and was, explained by the trial judge during jury instructions. *Cf. Chambers v. State*, 337 Md. 44, 48, 650 A.2d 727, 729 (1994) ("The main purpose of a jury instruction is to aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict."); *see also Dickey v. State*, 404 Md. 187, 197, 946 A.2d 444, 450 (2008) ("Jury instructions direct the jury's attention to the legal principles that apply to the facts of the case.") (quotation mark and citation omitted). In fact, the admissibility of expert testimony that explains the law is dubious. *See Franceschina v. Hope*, 267 Md. 632, 643, 298 A.2d 400, 406 (1973) (citing, with approval, the following statement from Edmund M. Morgan, *Basic Problems of Evidence* 218 (1962): "When a standard ... has been fixed by law, no witness whether expert or nonexpert ... is permitted to express an opinion as to whether or not the person or

---

7. U.S. Const. amend. IV provides:

 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

conduct in question measures up to that standard. On that question the Court must instruct the jury as to the law, and the jury must draw its own conclusions from the evidence"); *see also* Lynn McLain, *Maryland Evidence*, § 702:3(a) at 737 (2d. ed.2001) ("Opinions on questions of law are generally inadmissable."); Joseph F. Murphy, Jr., *Maryland Evidence Handbook*, § 1407 at 675 (4th ed.2010) ("The expert is not permitted to express an opinion on a question of law.").

The jury in the case at bar, after being properly instructed on the applicable Fourth Amendment law by the trial court, needed only its "common knowledge or experience," *Cent. Cab Co.*, 259 Md. at 551, 270 A.2d at 667, to understand that an officer violates the Fourth Amendment if the officer crosses the threshold of a home (here, by placing his foot in a home's doorway in order to block the door from closing) without proper authority to do so. We therefore hold that Petitioner did not fail to establish the relevant standard of care in presenting her case for the State's negligent training of its deputy sheriffs on Fourth Amendment doctrine.

## C. Sufficiency of the evidence of a breach?

Finally, the parties dispute whether there was legally sufficient evidence to establish whether the State breached its duty to Petitioner. This dispute divides into two sub-issues. First, Petitioner and the State comprehend differently the Fourth Amendment standard that governs entry of a home to execute an arrest warrant of a person suspected of being inside. Second, the parties disagree about whether there was sufficient evidence that Deputies Falby and Henderson were negligently trained by the State, in effect, to violate the pertinent Fourth Amendment standard.

The Fourth Amendment rules for executing an arrest warrant in a home are not in doubt. The threshold rule, long accepted by the United States Supreme Court, is that, except when pursuant to valid consent or exigent circumstances (neither of which is present here), "the entry into a home to conduct a search or make an arrest is unreasonable

under the Fourth Amendment unless done pursuant to a warrant." *Steagald v. United States,* 451 U.S. 204, 211, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *accord Kentucky v. King,* — U.S. ——, ——, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011); *Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006); *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Johnson v. United States,* 333 U.S. 10, 13–15, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Consequently, "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton,* 445 U.S. at 590, 100 S.Ct. 1371.

In *Payton,* the Court held that an arrest warrant suffices to authorize law enforcement to enter the home of the subject of the arrest warrant, if, at the time of the entry, the police have reason to believe the arrestee is in his or her home. *Id.* at 602–03. In *Steagald,* the Court held that an arrest warrant does *not* authorize law enforcement to enter a third person's home to arrest the subject of the arrest warrant, even if the officers have reason to believe the subject of the arrest warrant is inside that home. 451 U.S. at 213–14, 101 S.Ct. 1642. In that latter scenario (and absent valid consent to enter or exigent circumstances), the law enforcement officers may not enter the home of the third person to execute an arrest warrant, unless the officers are armed with a warrant to search the home of that third party, and the search warrant is supported by the probable cause-based averment of the affiant that the subject of the arrest warrant is in the home of such third person. *Id.* at 216, 222, 101 S.Ct. 1642. An arrest warrant for the subject believed to be in the home of the third party will *not* suffice to authorize entry into the third party's home.[8] *Id.* at 215, 101 S.Ct. 1642.

---

8. The *Steagald* Court explained the distinction between the two situations and why each requires its own Fourth Amendment rule. The rationale for the *Payton* rule is that,

 The State does not dispute that it has the duty to train its deputies in accordance with Fourth Amendment principles. Those rules, applicable here, are the rules established long ago in *Payton* and *Steagald.* The State is of the view that Petitioner failed to present any evidence that the State negligently trained Deputies Falby and Henderson in compliance with those Fourth Amendment rules. The Court of Special Appeals agreed with the State and held that the Circuit Court committed legal error in denying the State's motions for judgment and judgment notwithstanding the verdict. Petitioner continues to maintain that she presented legally sufficient evidence of the State's breach of the duty to provide proper training in the applicable Fourth Amendment principles. We agree with Petitioner.

 "An appellate court reviews the trial court's decision to allow or deny judgment or [judgment notwithstanding

---

[i]f there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.
*Steagald v. United States,* 451 U.S. 204, 214 n. 7, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (quoting *Payton v. New York,* 445 U.S. 573, 602–03, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).
The *Steagald* Court continued:
Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home. This analysis, however, is plainly inapplicable when the police seek to use an arrest warrant as legal authority to enter the home of a third party to conduct a search. Such a warrant embodies no judicial determination whatsoever regarding the person whose home is to be searched. Because it does not authorize the police to deprive the third person of his liberty, it cannot embody any derivative authority to deprive this person of his interest in the privacy of his home. Such a deprivation must instead be based on an independent showing that a legitimate object of a search is located in the third party's home. We have consistently held, however, that such a determination is the province of the magistrate, and not that of the police officer.
*Id.* at 214–15 n. 7, 101 S.Ct. 1642.

the verdict] to determine whether it was legally correct, while viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party." *Scapa*, 418 Md. at 503, 16 A.3d at 163 (quotation marks and citation omitted). We must affirm the denial of a motion for judgment or judgment notwithstanding the verdict if there is "any evidence, no matter how slight, that is legally sufficient to generate a jury question." *C & M Builders, LLC v. Strub*, 420 Md. 268, 291, 22 A.3d 867, 880 (2011). Put another way, we will reverse the trial court's denial of a motion for judgment or judgment notwithstanding the verdict only if the facts and circumstances permit but a single inference as relates to the appellate issue presented. *See Scapa*, 418 Md. at 503, 16 A.3d at 163.

Petitioner maintains that we need only look to the testimony of the two deputies for evidence of the State's negligent training of Deputies Falby and Henderson in connection with the Fourth Amendment's dictates concerning in-home execution of arrest warrants. Petitioner directs us to the following testimony.

Deputy Falby testified that "the only law enforcement training that [he] received was in connection with [his] job as a Deputy Sheriff [with] Prince George's County." He also testified that part of his training was learning the difference between an arrest warrant and a search warrant. Deputy Falby further testified:

> [Petitioner's Counsel]: According to your training, does the house that you're going to enter [with an arrest warrant] have to be the home of the actual arrestee?
>
> [Deputy Falby]: *No. The warrant has an address on it, and that's the address we normally go to that's on the warrant.*
>
> [Petitioner's Counsel]: And that's what you've been trained to do, right?
>
> [Deputy Falby]: Correct.
>
> * * *
>
> [Petitioner's Counsel]: Even if it's not the address where the actual arrestee is?

[Deputy Falby]: *We're assuming that's where he lives.*

[Petitioner's Counsel]: *But you haven't been trained or taught, as he said, to only go to the house of the arrestee?*

[Deputy Falby]: *Well, the address on the warrant, sir.*

[Petitioner's Counsel]: Just the warrant?

[Deputy Falby]: Yes, sir.

(Emphasis added). Additionally, Deputy Falby testified that whenever a door opens while he is serving an arrest warrant he is to cross the threshold by placing his leg in the way of the door (thereby entering the home):

[Petitioner's Counsel]: You've been trained to do that. Door opens, your leg goes in?

[Deputy Falby]: Right. *Once we're in the process of arresting someone or believe they're inside.*

(Emphasis added).

Deputy Henderson, like Deputy Falby, testified that he had been trained by the State. When asked about his understanding, according to his training, about the requirements to enter a home, Deputy Henderson replied as follows:

[Counsel for the State]: What is necessary for you to enter a dwelling forcibly when you have an arrest warrant?

[Deputy Henderson]: Reasonable suspicion and belief that the suspect is inside.

The deputies' testimony, viewed in the light favorable to Petitioner, and examined through the prism of the proper standard of care (here, training that is consistent with the Fourth Amendment principles announced in *Payton* and *Steagald* ) provides the requisite "slight evidence" that the deputies were negligently trained by the State. From their testimony, a jury could find that Deputies Falby and Henderson were trained that an arrest warrant carries with it the authority forcibly to enter a home, the address of which was listed on the arrest warrant (but not necessarily the home of the arrestee), based solely on a belief that the arrestee is inside that home at the time of the entry. As characterized by the deputies, such training is contrary to the dictates of

*Payton* and *Steagald,* which draw the important distinction between the sort of warrant that authorizes the forcible entry of the *arrestee's* home (an arrest warrant for the arrestee) and the sort that authorizes the forcible entry of a *third party's* home (a search warrant that reflects probable cause that the arrestee is inside that home). Because there was the requisite slight evidence of a breach of the State's duty to provide the deputies with training that meets the standard of care (compliance with Fourth Amendment law), the trial court did not err in denying on that ground the State's motions for judgment and judgment notwithstanding the verdict.

Finally, we say a word about the State's argument that, even assuming that Petitioner presented sufficient evidence of a duty owed and breached, the Circuit Court should have granted judgment in the State's favor because Petitioner failed to establish that the State's breach was the proximate cause of Petitioner's damages. We reject this contention.

To constitute a proximate cause, the deputies' training must be "1) a cause in fact, and 2) a legally cognizable cause." *Pittway Corp. v. Collins,* 409 Md. 218, 243, 973 A.2d 771, 786 (2009). The deputies' negligent training in connection with what the arrest warrant authorized them to do—forcibly enter the home of Petitioner—was, "more likely than not," "a substantial factor in producing" the altercation that led to Petitioner's injuries. *Id.* at 244, 973 A.2d at 787. The deputies' negligent training, moreover, was the legally cognizable cause of Petitioner's injuries because the altercation that caused them was a "foreseeable result" of the improper training. *Id.* at 246, 973 A.2d at 788.

In sum, Petitioner presented legally sufficient evidence of her claim that the State was liable to her in tort for the negligent training of Deputies Falby and Henderson. Accordingly, the Circuit Court properly denied the State's motions for judgment and judgment notwithstanding the verdict.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF**

THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT, THE STATE OF MARYLAND.